Case No. 24-10449-J

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

FLORIDA VIRTUAL SCHOOL,

       Plaintiff-Appellant,

v.

K12, INC., and K12 FLORIDA, LLC,

       Defendant-Appellees.

_____

## Appeal from the United States District Court
## for the Middle District of Florida

---

## PRINCIPAL BRIEF OF FLORIDA VIRTUAL SCHOOL

---

Thomas E. Bishop
Florida Bar Number 956236
John S. Mills
Florida Bar Number 107719
Kyle William Mason
Florida Bar Number 1045149
Katharine Roth
Florida Bar Number 106692

BISHOP PAGE & MILLS, PLLC
510 N. Julia Street
Jacksonville, FL 32202
Tel. (904) 598-0034
Fax. (904) 598-0395
tbishop@bishoppagemills.com
jmills@bishoppagemills.com
kmason@bishoppagemills.com
kroth@bishoppagemills.com
service@bishoppagemills.com

*Attorneys for Appellant Florida Virtual School*

**Certificate of Interested Persons and Corporate Disclosure Statement**

In compliance with 11th Cir. R. 26.1-1, the undersigned certifies that the following is a complete list of all trial judge(s), attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal, and includes subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of Appellant's stock, and other related identifiable legal entities.

1. Barto Hill, Suzanne

2. Bishop Page & Mills, PLLC

3. Bishop, Thomas

4. Carlton Fields, P.A.

5. Culley, Salley R.

6. D'Agata, David J.

7. Florida Department of Education

8. Florida Virtual School Board of Trustees

9. Guzman, Luis R.

10. Hollman, Steven P.

11. Johnson, Daniel C.

12. K12 Florida, LLC

13. K12 Management, Inc.

14. Kidd, Embry J. – United States Magistrate Judge

15. Luther Law PLLC

16. Luther, Stephen

17. Mason, Kyle W.

18. Mills, John S.

19. Presnell, Gregory A. – Senior United States District Court Judge

20. Roth, Katharine

21. Rumberger, Kirk & Caldwell, P.A.

22. Shanedling, Abraham J.

23. Sheppard, Mullin, Richter & Hampton LLP

24. Spencer-Davis, Charles H.

25. State of Florida

26. Stride, Inc.

27. Yost, Eleanor M.

No publicly held company owns 10% or more of Appellant's stock.

Respectfully submitted,

/s/ Thomas E. Bishop
Attorney

## STATEMENT REGARDING ORAL ARGUMENT

Appellant-Plaintiff Florida Virtual School ("FLVS") respectfully requests oral argument due to the complex legal, factual, and public interest issues raised by this appeal from final judgment. This appeal is the culmination of nearly two decades of intellectual property disputes between two of Florida's largest online education providers, spanning two separate lawsuits with previous appeals to this Court and the Florida Supreme Court. The record contains 397 docket entries. This appeal challenges three grants of summary judgment, three *Daubert* orders, a denial of a motion for jury trial, and findings from a two-phase bench trial.

These rulings addressed important and complex legal questions concerning the constitutional jury trial right, the proper application of the trademark likelihood-of-confusion factors, false advertising, and the admissibility of expert opinions.

There is great public interest in this appeal. FLVS is a Florida agency charged by the Florida Legislature with acquiring and protecting trademarks to generate funds for public education. § 1002.37(2)(c), Fla. Stat. If upheld, the district court's judgment may have a detrimental impact to FLVS's ability to pursue this statutory mission.

All these reasons suggest the benefit of oral argument.

i

## <u>TABLE OF CONTENTS</u>

STATEMENT REGARDING ORAL ARGUMENT .................................................. i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF CITATIONS ........................................................................ iv

STATEMENT OF JURISDICTION .......................................................... 1

STATEMENT OF THE ISSUES ............................................................... 2

STATEMENT OF THE CASE .................................................................. 4

    Statement of the Facts ...................................................................... 4

    Course of Proceedings ..................................................................... 17

    Standards of Review ........................................................................ 23

SUMMARY OF THE ARGUMENT ....................................................... 24

ARGUMENT ......................................................................................... 26

    I.    The district court erred in rejecting the FLOS infringement

         claims ........................................................................................ 26

         A.    A jury trial is necessary because FLVS presented

                evidence of actual damages. ..................................................... 26

         B.    Alternatively, the district court clearly erred in evaluating

                likelihood of confusion. ........................................................... 31

         C.    Gallogly's lost profit opinions are reliable and helpful. .......... 42

II.    The district court erred in entering summary judgment on the FLVA.com infringement claim. ...........................................................46

III.    The district court erred in resolving the false advertising claim .........50

IV.    The district court erred in limiting disgorgement and excluding Gallogly's Disgorgment opinions .........................................................55

V.    The court should reassign this case on remand. .................................57

CONCLUSION ......................................................................................................61

## TABLE OF CITATIONS

### CASES

*A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997

(11th Cir. 2003) ................................................23

*Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229 (11th Cir. 2008) ........................29

*Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161 (11th Cir. 1994)....................27

*Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8 (1st Cir. 2004). 29, 30, 31

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................47

*Burns v. Lawther*, 53 F.3d 1237 (11th Cir. 1995).............................. 23, 27

*Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999)...............................49

*Clorox Co. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24 (1st Cir. 2000) ....54

*Custom Mfg. & Eng'g, Inc v. Midway Servs., Inc.*, 508 F.3d 641 (11th Cir. 2007)

................................................27

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962) ...................................27

*FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939 (11th Cir. 2023)

................................................ passim

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242 (11th Cir.

2016) ................................................ 34, 35

*Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221 (11th Cir.

2013). ................................................46

iv

*Florida Virtual School v. K12, Inc.*, 148 So. 3d 97 (Fla. 2014)................................8

*Florida VirtualSchool v. K12, Inc.*, 773 F.3d 233 (11th Cir. 2014) ..........................8

*Florida VirtualSchool v. K12, Inc.*, 735 F.3d 1271 (11th Cir. 2013) ....................7, 8

*FTC v. On Point Cap. Partners, LLC*, 17 F.4th 1066 (11th Cir. 2021)...................52

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993 (2d Cir. 1997) ......38

*Funding Sys. Leasing Corp. v. Pugh*, 530 F.2d 91 (5th Cir. 1976).........................49

*Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256 (11th Cir. 2004)............... 50, 51

*In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646 (N.D. Ill. 2006)......................43

*Jack Daniel's Properties, Inc. v. VIP Prod. LLC*, 599 U.S. 140 (2023) .................36

*JA Apparel Corp. v. Abboud*, 568 F.3d 390 (2d Cir. 2009).....................................39

*Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833 (11th Cir. 1983) .........50

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242 (11th
      Cir. 2002) ................................................................................. 50, 53

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001).............38

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005).........................23

*Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535 (11th Cir. 2013)
      ................................................................................. 46, 48, 60

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203 (1942)......
      ................................................................................. 55, 56

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578 (3d Cir. 2002) ........................................................54

*Osmose, Inc. v. Viance*, 612 F.3d 1298 (11th Cir. 2010)..........................................54

*PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159 (11th Cir. 2019) ..........38

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982)....................................................42

*Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562 (11th Cir. 1986) ………

...................................................................................................... passim

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989)..............................52

*Sancom, Inc. v. Qwest Commc'ns Corp.*, 683 F. Supp. 2d 1043 (D.S.D. 2010)......44

*Small v. State*, 249 So. 3d 675 (Fla. 2d DCA 2018)..................................................49

*Tana v. Dantanna's*, 611 F.3d 767 (11th Cir. 2010) ..................................................42

*Thornburg v. Gingles*, 478 U.S. 30 (1986)................................................................24

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).......................................42

*United States v. Torkington*, 874 F.2d 1441 (11th Cir. 1989) .............. 57, 58, 59, 60

*United States v. White*, 335 F.3d 1314 (11th Cir. 2003)...........................................24

*Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484 (11th Cir. 1987) ......................................................................................................55

*World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482 (5th Cir. 1971) ...............................................................................................................35

*Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114 (11th Cir. 2022) .............................35

# STATUTES AND RULES OF COURT

15 U.S.C. § 1117(a) ................................................................55

15 U.S.C. § 1125(c)(2)(A). .....................................................34

28 U.S.C. § 1291 .......................................................................1

28 U.S.C. § 1331 .......................................................................1

28 U.S.C. § 1367 .......................................................................1

28 U.S.C. § 2106 .....................................................................58

Fla. Stat. § 1002.37(1)(a) ..........................................................4

Fla. Stat. § 1002.37(2)(c) ..........................................................4

Fla. Stat. § 1006.73 .................................................................34

Fed. R. App. P. 4(a)(2) ..............................................................1

Fed. R. Evid. 615 ....................................................................39

## OTHER AUTHORITIES

INTER ALIA, Black's Law Dictionary (11th ed. 2019) ...........48

## STATEMENT OF JURISDICTION

FLVS brought federal and state claims for trademark infringement and false advertising. (D1:12–19). The district court had jurisdiction over the federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367 because the state claims arose from the same set facts.

The district court announced its final decision on January 2, 2024, and the clerk entered final judgment against FLVS on February 29, 2024. (D369;D389). FLVS appealed on February 12, 2024, under Fed. R. App. P. 4(a)(2), and filed an amended notice of appeal on March 12, 2024. (D381;D395). Accordingly, the Court has jurisdiction over this final appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred as a matter of law by denying FLVS its constitutional right to a jury trial for its trademark infringement claims when record evidence showed actual damages for which a jury trial is a matter of right.

2.  Whether the district court clearly erred in finding no likelihood of confusion under the trademark infringement factors by disregarding uncontroverted evidence of trademark strength and actual confusion, clear similarities between the parties and the marks, and a two-decade long pattern of infringement.

3.  Whether the district court erred by *sua sponte* granting summary judgment on the FLVA.com infringement claim without notice when it was alleged in the Complaint and arose after the Effective Date of the 2015 Settlement Agreement.

4.  Whether the district court erred by granting summary judgment on FLVS's false advertising claim and excluding the opinions of its survey expert when K12's comparative advertising was literally false by necessary implication and the qualified expert's reliable survey methodology permitted a factfinder to determine the Checklist was misleading.

5.  Whether the district court erred by excluding FLVS damages expert's lost profits and non-FLOS disgorgement opinions when his qualifications were

2

unchallenged, his calculations methodology reliable and relevant, and his opinions helpfully explained complex damages calculations and revenues.

6.      Whether the Court should exercise its supervisory authority to reassign this case on remand when the previously reversed district judge repeatedly disparaged FLVS as a "trademark bully" intentionally harassing K12 through weak marks and engaged in procedural irregularities.

<u>**STATEMENT OF THE CASE**</u>

**Statement of the Facts**

Plaintiff-Appellant Florida Virtual School ("FLVS") is a state agency founded by the Florida Legislature to develop and deliver "online and distance learning education." Fla. Stat. § 1002.37(1)(a). A key part of FLVS's legislative mandate and strategy is the creation, development, and protection of intellectual property like trademarks. § 1002.37(2)(c); (D342:75–77).[1]

FLVS registered the following related trademarks (the "FLVS marks"):

| MARK | REGISTRATION NUMBER |
|---|---|
| FLORIDA VIRTUAL SCHOOL | 3,830,765 |
| FLVS | 3,873,393 |
| FLORIDA VIRTUAL SCHOOL | 5,113,225 |
| FLVS | 5,113,235 |
|  | 5,113,241 |

---

[1]    "(D342:75–77)" refers to docket entry 342, pages 75 through 77. All record cites herein follow this format.

| | |
|---|---|
|  | 5,113,248 |
|  | 5,113,259 |

(D351-61;D351-62;D351-63;D351-64;D351-65;D351-66;D351-67). The marks "Florida Virtual School" (No. 3,830,765) and "FLVS" (No. 3,873,393) have been declared incontestable. (D351-15:29;D351-18:18).

FLVS has used these marks for decades to promote its services throughout Florida and the nation. (D351-15:1;D351-18:1). One of the first online education providers in Florida, FLVS began its existence by developing and providing high school courses to select Florida schools. (D302:15;D331:113;D334:8,82). FLVS now offers hundreds of online courses for elementary, middle, high school, post-secondary (through dual enrollment), and special education students. (D351-59;D334:159–164,175–179). These courses include all core subjects required for

high school graduation in Florida and other states, such as English, Math, Science, and Social Studies, and many elective programs. (D351-59;D334:155–173). FLVS offers these courses to students through a variety of structures, including full-time and part-time programs and partnerships with parents, schools, and school districts. (*Id.*;D334:182–183). FLVS has enabled over 7,360,000 student semester completions. (D34:98–99). FLVS and its courses regularly receive acclamation in the online education industry, earning 57 industry awards. (D351-69).

FLVS spends millions annually on advertising throughout Florida and the nation to promote its marks and services to parents, students, schools, and school districts. (D337:26–29). These efforts include internet advertising via websites, social media, search engine results, and paid keyword advertising; outreach through partners and schools; and in-person advertising at trade conferences. (D337:19–30). FLVS advertisements cause over 78 million annual "impressions," or consumer interactions with advertisements. (*Id.*). This advertising, combined with the decades of goodwill FLVS built through its high-quality education programs, led FLVS to have the highest Florida consumer recognition among online education providers, with 50–55% of potential online education customers consistently recognizing FLVS when prompted in monthly third-party brand recognition surveys conducted in 2020 and 2021. (D338:71–72;D351-21:6). By contrast, potential online education customers consistently recognized the

competing "K12" brand around 25–35% of the time when prompted in those same surveys. (*Id.*).

Defendants-Appellees K12, Inc. (n/k/a Stride, Inc.) and K12 Florida, LLC (collectively, "K12") are for-profit companies that compete with FLVS to develop, deliver, market, and sell online educational services and courseware to kindergarten through twelfth grade students throughout Florida and the nation. (D155:2–4,32–34). K12, Inc. is the parent company, and K12 Florida, LLC, is its wholly owned subsidiary which runs K12's Florida operations. (*Id.*). K12, like FLVS, advertises to students, parents, schools, and school districts via its websites, purchased keyword searches, and social media. (D302:16;D338:32–36,41–42).

In 2003, K12 began providing online education in Florida using the names "Florida Virtual Academy," "FLVA," "Florida Virtual Program," and "FLVP" (collectively, the "Prior Marks"). (D155:35;D350-14). This led FLVS to sue K12 in the Middle District of Florda ("the Prior Lawsuit"). (D302:16;D350-14). District Judge Gregory Presnell dismissed the Prior Lawsuit without prejudice at the motion to dismiss stage after concluding that FLVS lacked the authority under Florida law to sue for trademark infringement, despite FLVS's enabling statute specifically granting FLVS the authority to "acquire, enjoy, use, and dispose of . . . trademarks." *Florida VirtualSchool v. K12, Inc.*, 735 F.3d 1271, 1273–75 (11th Cir. 2013). FLVS appealed, and this Court certified a question to the Florida

Supreme Court on whether FLVS had the statutory authority to prosecute trademark actions. *Id.* The Florida Supreme Court accepted the certified question and unanimously held that FLVS "had the authority to enforce and protect its rights through legal action." *Florida Virtual School v. K12, Inc.*, 148 So. 3d 97, 105 (Fla. 2014). Accordingly, this Court reversed the dismissal and remanded for further proceedings. *Florida VirtualSchool v. K12, Inc.*, 773 F.3d 233 (11th Cir. 2014).

Shortly after remand, the parties executed the "2015 Settlement Agreement" to resolve the Prior Lawsuit. (D350-14). This agreement provided that K12 would, among other things, (1) pay FLVS $600,000, (2) cease using the Prior Marks by June 30, 2016, including changing K12 URLs that contained the Prior Marks, and (3) assign its rights in the Prior Marks to FLVS. (D350-14:2–8,10). The agreement contained a list of twelve "Approved Marks" that K12 could freely use. (D350-14:16). The agreement contained several safe harbor provisions permitting K12 to use the Prior Marks for limited purposes beyond June 30, 2016, including a "URL Safe Harbor" allowing K12 to use the Prior Marks in URLs until December 31, 2016, solely to redirect consumers to its websites. (D350-14:3–5). FLVS and K12 also released each other from any claims related to the Prior Lawsuit they may have had on or before November 3, 2015. (D350-14:8–9).

Two weeks after executing this agreement, K12 acquired the "FLVA.com" domain. (D142-17:20–21). K12 then used FLVA.com to redirect web traffic to its Florida Cyber Charter Academy ("FLCCA") website. (*Id.*). FLCCA was the new name for K12's FLVA and FLVP programs following settlement. (D330:43–44). K12 used FLVA.com to redirect web traffic to FLCCA's website until September 21, 2020, well past the URL Safe Harbor's expiration on December 31, 2016. (D142-17:20–21;D350-14:3–5).

In 2019, K12 opened a new online school named "Florida Online School" or "FLOS" (collectively, "the FLOS marks") through an agreement with the Hendry County school board. (D302:17;D353:51;D350-16). This agreement allowed K12 to enroll students throughout Florida for online education. (D350-16;D354:6–7). K12 received approximately 95% of the revenue from FLOS and had the primary responsibility for staffing teachers and administrators, providing resources, and educating students. (D350-16:8;D342:212–213;D353:37–38). K12 executives chose the name "Florida Online School" because they believed that name would "rank very well from an SEM/SEO perspective."[2]  (D351-54;D351-55;D350-24).

---

[2]     "SEM" stands for "search engine marketing." (D334:137). "SEO" stands for "search engine optimization." (D338:63). Both terms refer to maximizing the possibility that a company's website will appear when potential customers perform relevant web searches, including searches for competitors. (D338:63–64).

In so doing, K12 considered and rejected a dozen Approved Marks from the Settlement Agreement. (D350-14:16;D342:216).

FLOS, like FLVS, served kindergarten through twelfth grade, post-secondary, and special education students and offered courses in core subjects like English, Math, Science, Social Studies, and various electives. (D302:16;D354:10). FLOS ultimately operated throughout Florida, with 95% of its students living outside Hendry County. (D353:88). K12, like FLVS, advertised FLOS via its websites and through search engine optimization, paid keyword advertising, and social media. (D342:220–227).

K12 changed the name of FLOS to Digital Academy of Florida ("DAOF") in February 2021 after FLVS initiated this lawsuit. (D342:168). K12 maintained thereafter that it wholly abandoned the FLOS marks. (D17:12;D139:17–18,39;D302:8). However, K12 continues to use "Florida Online School" on its Florida landing page. (D351-86;D338:60–68).

K12's adoption of the FLOS marks caused significant actual confusion between FLOS and FLVS amongst students, parents, and school officials throughout Florida and the United States. (D351-3;D351-4;D351-5;D351-7;D-351-8;D351-9;D351-10;D351-11;D351-35;D351-36;D351-37;D351-38;D351-40;D351-42;D351-43;D351-44;D351-45;D351-47;D351-48;D351-49;D351-50;D351-51;D351-53;D351-70;D351-71). For example, parent Casey Kalajian

testified that she accidentally enrolled her daughter in FLOS instead of FLVS because she "thought FLOS was FLVS" as "online and virtual, to me, are interchangeable." (D338:105–113;D351-37). Although she later discovered her mistake, she ultimately chose not to enroll her daughter in FLVS that year because her initial mis-enrollment pushed her daughter's start date past the start of the school year. (*Id.*). Similarly, parent Lisa Kornheisl mistakenly enrolled her son in FLOS instead of FLVS due to her confusion over the names, even though she was an elementary school teacher who had previously enrolled her children in FLVS and non-FLOS K12 programs and conducted extensive research.[3] (D351-39;D342:14–20).

Numerous emails from parents, students, and school officials further demonstrated widespread confusion about the difference between FLOS and FLVS:

- A social worker contacted FLVS for a FLOS student's enrollment records after the student's father said he "has been enrolled in FLOS (Florida Online School) which is a part of FLVS." (D351-9).

- A parent emailed a FLOS administrator to ask about testing for his third-grade student at "K12 Florida Virtual School," and said he also had a "5th grade[r] in K12 Florida Virtual School." (D351-53).

---

[3] Kornheisl is partially blind. (D342:13). However, as demonstrated at trial, she can read computer screens zoomed in, which she did when researching FLVS and attempting to enroll her son. (D342:14).

- A FLOS student emailed his FLOS teacher that "I am in 6th grade and I am just starting Florida Virtual School." (D351-49).

- A parent emailed her daughter's FLOS teacher asking "if there are any activities/team that [redacted] could join in being that she is in Florida virtual School." (D351-43).

- A FLOS parent emailed a FLOS teacher that "I am new to Florida virtual school." (D351-51).

- A student emailed a FLOS teacher that she was having trouble because she was "new to FLVS," to which the FLOS teacher replied "welcome to Florida Online School (not Florida Virtual School)." (D351-40).

- A parent contacted both FLVS and FLOS employees to ask about the status of her daughter's enrollment in FLOS. (D351-3).

- A parent emailed FLVS to postpone their student's "other classes with Florida online school[.]" (D351-5).

- A parent of an FLVS student "decided to do a different curriculum" and asked how to "make sure he gets unenrolled from his Florida Online School classes?" (D351-10).

- A parent emailed her son's FLOS teacher that "I am withdrawing [my son] from Florida virtual school." (D351-70).

- A FLOS student emailed her FLOS teacher asking to withdraw as "I will not be attending Florida Virtual School next [semester]." (D351-71).

Internal emails between FLOS employees show that K12 recognized that students, parents, and schools regularly confused FLVS and FLOS:

- When a Texas school administrator emailed FLOS to obtain a transcript for an incoming FLVS student, FLOS employee Kimberly Kershner replied that "FLVS is actually a different school. Our school gets mixed up all the time with this one lol." (D351-47).

- Florida students are required to make a "My Career Shines" account via a third-party website. (D351-35). FLOS employees specifically instructed students to select "Florida Online School (NOT Florida Virtual)" when making these accounts because "some students have chosen Florida Virtual School by mistake." (*Id.*).

- A FLOS employee told another FLOS employee that she was "concerned this parent is mixing FLVS up with FLOS" after a series of emails with a parent confused about her daughter's enrollment status. (D351-45). The FLOS employee had to highlight and capitalize "ONLINE" and "VIRTUAL" to distinguish them for the parent. (*Id.*)

- After a parent asked a FLOS teacher to "remove us from your mailing lists" but said her daughter "needs to stay enrolled in FL Virtual," the FLOS teacher separately told a FLOS administrator that "[i]t sounds like she is enrolled in both FLOS and FL virtual." (D351-50). The FLOS administrator agreed that "[i]t sounds like the parent has confused us with FLVS."(*Id.*).

- A student emailed a FLOS counselor saying she has "registered for FLVS by myself." (D351-42). The FLOS counselor told the student that "We are not partners with FLVS. You should not be taking any classes with them," and then separately emailed another FLOS employee that "Students keep signing up for FLVS." (*Id.*).

Kershner and FLOS marketing director James Dale also testified that students, parents, and officials sometimes mistook FLOS for FLVS. (D349-3A;D349-5). Even K12 employees sometimes confused FLOS with FLVS—one parent complained to a FLOS teacher that "K12 Customer Support" gave her the number "for Florida Virtual School/FLVS" when she called seeking help for her FLOS-enrolled daughter. (D351-46).

K12 also hosts a "Comparison Checklist" ("the Checklist") on K12.com indicating that K12 provided services other online education services did not.

(D181-1:180;D144-1:57). The left column of the Checklist, entitled "K12 Powered Schools," contains a series of online education services with corresponding checked boxes showing that K12 purportedly provides all such services. (*Id.*). These services include kindergarten through twelfth grade curriculum and accreditation, honors and STEM classes, extracurricular activities and support programs, and live teachers. (*Id.*). Conversely, the right column of the Checklist, entitled "Other Online Learning Solutions," contains the same series of online education services with *un*checked boxes. (*Id.*). But FLVS provides every service listed in the Checklist. (D144-1:5;D351-59;D334:173–179). The webpage preceding the Checklist initially compared K12's services to FLVS's services by asking "What makes K12-powered schools different from other online learning solutions like Connections Academy, FLVS, and Time4Learning?" (D144-1:57). K12 eventually removed the explicit reference to FLVS but kept the Checklist online. (D181-2:2–3).

    FLVS retained Dr. Jeffery Stec to survey consumer perceptions of the Checklist and whether those perceptions increased the likelihood that they would enroll with K12. (D181-1:4). Dr. Stec is a Managing Director with Berkeley Research Group and the leader of its Intellectual Property practice with extensive experience in conducting survey research. (D181-1:5). Dr. Stec found that after reviewing the Checklist 18.3% of consumers believed K12 provided features its

competitors did not. (D181-1:28–30). Additionally, Dr. Stec found that 14.3% of consumers "were either very likely or somewhat more likely to enroll their children in a K12-powered school" after reviewing the Checklist. (*Id.*). Based on these results, Dr. Stec opined that the Checklist gave consumers the impression that K12 offered services FLVS and other competitors did not, and increased the likelihood that consumers would enroll their children in a K12 school. (*Id.*).

FLVS damages expert Daniel Gallogly created a model for calculating (1) the profits FLVS lost per student diverted to FLOS and (2) the total revenue K12 received for FLOS, FLCCA, and nationwide for disgorgement purposes. (D273-1:14–35). Gallogly is a certified public accountant ("CPA") with over 30 years of experience. (D273-1:3). Gallogly's lost profits model multiplied the number of full-time equivalent ("FTE") students who attended FLOS by the Full-Time Florida Education Finance Program ("FEFP") rates for those years. (D273-1:14–16). The FEFP rate is the statutorily determined rate Florida pays FLVS per FTE student in any given year. Fla. Stat. § 1011.62. Gallogly then multiplied these revenues by a "Contribution Margin Percentage" to determine FLVS's lost profits. (D273-1:21–26). The Contribution Margin Percentage represents the incremental direct costs and expenses FLVS would have incurred per additional FTE student. (D273-1:22). Gallogly calculated FLVS's Contribution Margin Percentage based

on his analysis of FLVS's historical revenues and costs, and his interviews with FLVS directors and accountants. (D273-1:21–26).

Since FLVS students often remain enrolled with FLVS for multiple years, Gallogly also created a model for calculating the future lost profits FLVS would have realized had FLOS students attended FLVS instead. (D273-1:17–20). Gallogly used FLVS's historical retention rates to project the number of FTE students who would have remained with FLVS until 2033, the year a kindergartener who enrolled in FLOS in 2021 would graduate high school. (*Id.*). Gallogly then calculated FLVS's projected lost profits by multiplying the projected FTEs by the Contribution Margin Percentage and a projected FEFP rate, which Gallogly derived by adjusting the actual 2022 FEFP rate with an annual assumed growth rate of 3% based on market conditions. (D273-1:21). Gallogly then applied a Discount Rate based on the weighted average cost of capital and the Capital Asset Pricing Model to determine the present value of these future lost profits. (D273-1:26–30). These models permitted the factfinder to calculate the profits FLVS would have realized per student diverted from FLVS to FLOS.

For his disgorgement analysis, Gallogly reviewed K12's financial documentation to determine its national, FLCCA, and FLOS revenues from January 2017 onwards. (D273-1:31–32). Gallogly confirmed K12's claimed U.S. and FLCCA revenues but found that K12 understated its FLOS revenues and

16

adjusted accordingly. (D273-1:32–33). Gallogly intentionally did not opine on liability or causation when developing his damages models, leaving this issue for the jury. (D273-1:9).

**Course of Proceedings**

FLVS sued K12 in 2020 to enjoin its continuing trademark infringement and false advertising, recover FLVS's lost profits, and disgorge K12's unlawfully obtained profits. (D1). FLVS pled eight counts: (1) infringement of its "Florida Virtual School" word marks (Nos. 3,873,393 and 5,113,235) under the Lanham Act; (2) infringement of its "FLVS" word marks (Nos. 3,873,393 and 5,113,235) under the Lanham Act; (3) infringement of its design marks (Nos. 5,113,241, 5,113,259, and 5,113,248) under the Lanham Act; (4) trademark infringement and false designation of origin under Section 43(a) of the Lanham Act; (5) false advertising under the Lanham Act via the Checklist; (6) common-law trademark infringement; (7) common-law unfair competition; and (8) breach of the 2015 Settlement Agreement by using FLVA.com. (D1:12–19). FLVS specifically identified K12's use of the FLOS marks and FLVA.com as "infringing" on its trademarks. (D1:10–11). The case was again assigned to Judge Presnell. (D16).

After answering FLVS's complaint and completing discovery, K12 moved for summary judgment and filed *Daubert* motions to exclude Gallogly and Dr. Stec's opinions. (D139;D170;D267). FLVS opposed these motions.

17

(D171;D181;D274). FLVS moved for partial summary judgment on its FLOS-related infringement claims and its breach of contract claim. (D143).

The district court granted K12's *Daubert* motion against Gallogly in part and excluded his testimony on FLVS's lost profits from FLOS. (D287). Although the court found that "Gallogly is qualified to testify as a damages expert," the court excluded his lost profits opinions as unreliable and unhelpful. (D287:4–7). The court held that "because Mr. Gallogly's lost profits opinion is wholly deficient, Plaintiff has *zero* evidence of actual damages, and there is nothing for a jury to consider regarding this issue." (*Id.*). The court then concluded that the infringement claims "will be resolved at a bench trial." (*Id.*).

A week later, the district court excluded Gallogly's FLCCA and U.S. disgorgement opinions in a separate order. (D295). The court excluded these opinions as irrelevant because "disgorgement is not a remedy for a breach of contract claim" and the court believed that FLVS had "combined and conflated its own allegations related to its trademark infringement claims with allegations related to its claim that Defendants breached the parties' 2015 Settlement Agreement." (D295:4–7). Suggesting FLVS had only pled infringement based on the FLOS marks, the court refused to "open the door to revenue that is *unrelated* to Defendants' allegedly infringing use of the name 'Florida Online School.'" (*Id.*).

18

Several days later, the district court denied the parties' cross-summary judgment motions on the FLOS-related infringement claims after finding that "genuine issues of material fact exist with respect to trademark infringement." (D297:24).

FLVS moved for reconsideration. (D299). FLVS pointed out that Gallogly's testimony was limited to establishing the amount of damages, not liability or causation of damages, and that FLVS instead relied on its extensive record evidence of actual confusion to establish a genuine issue of material fact on lost profits and the right to a jury trial. (*Id.*). FLVS also argued that disgorgement of K12's national and FLCCA profits was available, and Gallogly's disgorgement opinions relevant, because (1) FLVS plainly alleged that K12's use of FLVA.com to redirect consumers to FLCCA's website both breached the 2015 Settlement Agreement *and* constituted "infringement" upon FLVS's marks; and (2) K12's infringement was nationwide and the parties competed nationwide, so non-Floridians could have been and were in fact confused by K12's infringement. (*Id.*).

The district court denied the motion and issued multiple *sua sponte* grants of summary judgment in a bluntly worded order criticizing FLVS as "sophomoric" and "seemingly unable to comprehend or unwilling to accept the Court's rulings in this case" (including, apparently, the unexpected and unrequested rulings made in that very order). (D306). Although not pending on a motion, the court granted

19

summary judgment on FLVS's actual damages claims and denied the jury trial

demand because FLVS's damages evidence was insufficiently "specific."

(D306:3). Though also not pending on any motion, the court granted summary

judgment on the FLVA.com trademark infringement claim because FLVS did not

explicitly mention it in its partial summary judgment motion or its response to

K12's motion to dismiss, and because FLVS "released any such claims for

trademark infringement on that basis [i.e., the FLVA mark] when it executed the

2015 Settlement Agreement," even though the agreement did not release claims

arising after February 3, 2015. (D306:4). The court then limited the K12 profits

available for disgorgement to the two years FLOS operated. (D306:7).

Separately, the district court granted the motion to exclude Dr. Stec's

testimony and granted summary judgment on the false advertising claim. (D261).

Analyzing the *Daubert* motion first, the court found "Dr. Stec to be qualified to

conduct the instant survey." (D261:3). The court also found that "outside of

contextual issues, Dr. Stec's survey mechanics are generally acceptable and do not

invoke controversial analysis under *Daubert*." (D261:10). However, the court

excluded Dr. Stec's testimony as "flawed" and "ultimately based on a misleading

premise" because survey respondents could not access the websites of K12's

competitors to compare their services to K12's during the survey. (D261:7,9–10).

20

The court then granted summary judgment after finding that the Checklist was not literally false. (D261:12–13).

In October 2023, the district court held a two-phase, five-day bench trial on the parties' remaining claims. (D293). Phase I concerned trademark cancellation counterclaims asserted by K12,[4] and Phase II addressed FLVS's remaining infringement claims. (*Id.*). K12 invoked the Rule of Sequestration. (D330:6). In Phase II, FLVS called its senior director Jason Schultz and its chief operating officer Samuel Verghese to provide an overview of FLVS and its services, marketing directors Ashley Reyes and Kate Lysaught to discuss the parties' customer and advertising strategies, parents Kalajian and Kornheisl to testify about their actual confusion, and Gallogly to testify about FLOS's revenues and costs. (D334:155–182;D334:205–220;D337:11–58,110–115;D338:4–72,101–114;D342:11–19,27–59,68–81,113–135). K12 called its general manager Todd Goldthwaite, executive director Clark Berry, and Hendry County Superintendent Michael Swindle to dispute FLVS's likelihood of confusion evidence, and its vice president Michael Johnson and expert Shirley Webster to discuss damages. (D342:144–234;D353:10–41,50–95;D354:5–106).

---

[4]     The district court found in FLVS's favor on K12's counterclaims. (D390;D363). K12 did not cross-appeal these counterclaims.

FLVS showed mid-trial that K12 continued to use "Florida Online School" throughout its Florida landing page, "www.k12.com/florida-online-schools," and that consequently, this page was the fourth Google result when consumers searched for "Florida Virtual School." (D338:60–70;D351-85,D351-86). By the next day of trial, K12 altered the website and URL to remove "Florida Online School" usages. (D351-87;D351-88). Goldthwaite and Berry testified under cross-examination that K12's General Counsel told them the night before that "there was some concern" in court regarding this website and that the website had been changed as a result. (D342:206–213,223–232;D353:10–14,84–87).

The next morning, the district court expressed concern about why K12 "determined to tamper with evidence in the proceeding" and observed "[i]t certainly makes [K12] look bad." (D353:5). By way of explanation, K12 submitted a Goldthwaite/Berry email chain along with a cover letter for *in camera* review. (D356-2;D353:5–8;D354:109–110). FLVS was never provided with a copy of this email chain and it is not a part of the record. (*Id.*). However, the cover letter confirmed that K12 General Counsel Vincent Mathis directed this overnight change in response to trial testimony and included Goldthwaite and Berry in his communications. (D356-2). The cover letter said that "the intention [of the change] was to be respectful of the company's commitment to stop using the Florida Online School name in reference to the Hendry County program." (*Id.*). Despite this

commitment, K12 restored the previous version of the website containing "Florida Online School" to a secondary K12.com webpage after trial. (D362-1).

In its Phase II ruling, the district court found no likelihood of confusion between the FLVS and FLOS marks and ruled against FLVS on its remaining infringement claims. (D369). The court condemned FLVS as a "'trademark bully' harassing a competitor" through "feeble" and "grossly insufficient" claims. (D369:36).

This appeal followed.

**Standards of Review**

The Court reviews grants of summary judgment *de novo* while "view[ing] all the evidence and draw[ing] all reasonable inferences in favor of the non-moving party." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 946 (11th Cir. 2023).

The Court "review[s] the denial of a jury trial with the most exacting scrutiny." *Burns v. Lawther*, 53 F.3d 1237, 1240 (11th Cir. 1995).

The Court "reviews a trial court's *Daubert* rulings under an abuse of discretion standard." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005).

"On appeal following a bench trial, a district court's conclusions of law are reviewed *de novo*, and its findings of fact are reviewed for clear error." *A.I.G.*

*Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1003 (11th Cir. 2003). Clear error occurs when the Court is left "with the definite and firm conviction that a mistake has been committed." *United States v. White*, 335 F.3d 1314, 1319 (11th Cir. 2003). However, the clear error standard of review "does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986).

## SUMMARY OF THE ARGUMENT

The Court should reverse and remand for a jury trial on the FLOS-related infringement claims because FLVS presented sufficient evidence of actual damages to at least create a fact question. A reasonable jury, viewing the evidence in FLVS's favor, could find that Kalajian would have successfully enrolled her daughter in FLVS but-for her confusion over the FLOS marks. It can be logically inferred that FLOS also diverted other customers based on the substantial evidence of actual confusion and caused FLVS reputation and goodwill damage. This evidence of actual damages required a jury trial on the FLOS-related infringement.

Alternatively, the Court should reverse the district court's likelihood of confusion findings because the court misapplied the legal tests and the record establishes widespread actual confusion between the FLVS and FLOS marks, high

consumer recognition of the FLVS marks, near identity between FLVS and FLOS's customers, advertising, services, and trade channels, and a consistent pattern of ongoing infringement by K12 over the course of nearly two decades.

The Court should also reverse the grant of summary judgment on the FLVA.com infringement claim. FLVS plainly pled this claim in its complaint and provided record evidence in support. The district court erred by ignoring these allegations and evidence and misconstruing FLVS's arguments, and by improperly granting summary judgment on the claim without adequate notice or briefing. The unambiguous language of the 2015 Settlement Agreement does not bar this claim because it arose after February 3, 2015.

The Court should reverse the grant of summary judgment on FLVS's false advertising claim, and the wholesale exclusion of Dr. Stec's testimony. The district court erred when it decided, as a matter of law in a *Daubert* order and without viewing the evidence in FLVS's favor, that his testimony was inadmissible because consumers could eventually see through K12's deception with enough research. Dr. Stec's testimony established the misleading nature of the Checklist, rendering this a question for the factfinder. A factfinder could also find that the Checklist was literally false by necessary implication because it conveyed the message that K12 provided services that FLVS did not.

25

The Court should also reverse the orders limiting Gallogly's testimony and the disgorgement remedies available. Gallogly is a qualified CPA who employed reliable and accepted accounting practices beyond the understanding of an ordinary juror to create a lost profits model. Consequently, his lost profit opinions suffice under *Daubert*. Record evidence showed that K12's FLCCA profits are directly tied to its continued use of FLVA.com and so are recoverable. Likewise, K12's infringement and false advertising confused consumers nationwide.

Finally, the Court should exercise its supervisory authority to reassign this case to a new district judge on remand. The district judge created doubt about his ability to impartially resolve this case on remand by condemning FLVS as a trademark bully intentionally harassing K12. Reassignment would not entail waste or duplication because this appeal will resolve all outstanding pretrial issues and a new trial must be held on remand regardless of which judge presides.

## **ARGUMENT**

I. **The district court erred in rejecting the FLOS infringement claims.**

A. **A jury trial is necessary because FLVS presented evidence of actual damages.**

The district court erred in concluding FLVS was not entitled to a jury trial on its FLOS-related claims because FLVS presented record evidence of actual damages. "For a trademark infringement claim, a plaintiff must demonstrate (1) that it owns a valid mark with priority, and (2) that the defendant's mark is likely

to cause consumer confusion with the plaintiff's mark." *FCOA*, 57 F.4th at 946. "[T]he analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim[s]." *Custom Mfg. & Eng'g, Inc v. Midway Servs., Inc.*, 508 F.3d 641, 652-53 (11th Cir. 2007) (quotation omitted).

The Seventh Amendment preserves the right to a jury trial in trademark infringement actions where the plaintiff has presented evidence of actual damages. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472-78 (1962). The unconstitutional denial of a jury trial requires reversal unless "the issues could have been disposed of on summary judgment or judgment as a matter of law." *Burns*, 53 F.3d at 1242. A trademark "plaintiff must prove both lost sales and that the loss was caused by defendants' actions" to show "it suffered actual damages." *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1182 (11th Cir. 1994). But "Lanham Act damages may be awarded even when they are not susceptible to precise calculations" and where, as here, the nature of the infringement makes an exact determination impossible, the jury may approximate damages based on "just and reasonable inference." *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) (quotation omitted).

There is no dispute that the FLVS marks are valid registered marks with priority. (D302:16;D155:34). The district court correctly found that the FLOS-

related infringement claims survived summary judgment. (D297:24). But the court erred by finding that FLVS failed to present evidence of actual damages from K12's use of the FLOS marks. (D306:2–4). FLVS offered ample evidence.

Kalajian's testimony, viewed in the light most favorable to FLVS, establishes that she wanted to enroll her daughter in FLVS for the 2020–2021 school year, attempted to do so, but accidentally enrolled her daughter in FLOS because she was confused by the similarities between the FLOS and FLVS marks. (D338:106–108). As Kalajian succinctly put it, "[i]f there was no confusion, I wouldn't have signed her up for the wrong thing." (D171-1:21). Although she later discovered her mistake and attempted to enroll her daughter in FLVS, her daughter ultimately did not enroll in FLVS due to the delay caused by her initial confusion. (D338:108–112). A reasonable jury could find that Kalajian, had she not been confused by the FLOS marks, would have successfully enrolled her daughter in FLVS, and that FLVS would have earned an additional $4,694 in FEFP revenue and (after applying the 22% Contribution Margin Percentage) $3,661.32 in profit had she done so. (D273-1:15,23).

Kalajian's testimony, by itself, suffices to establish actual damages sufficient to trigger FLVS's right to a jury trial. But a reasonable jury could have properly inferred that the confusion caused by the FLOS marks diverted other sales from FLVS as well. Two witnesses, Kalajian and Kornheisl, testified that they

mistakenly enrolled their children in FLOS due to confusion caused by the mark. (D338:111;D342:16–19). The record is replete with documentary evidence of emails and communications demonstrating widespread and consistent confusion between FLOS and FLVS among students, parents, and school officials, and K12's recognition of that confusion. (D351-3;D351-4;D351-5;D351-7;D-351-8;D351-9;D351-10;D351-11;D351-35;D351-36;D351-37;D351-38;D351-40;D351-42;D351-43;D351-44;D351-45;D351-47;D351-48;D351-49;D351-50;D351-51;D351-53;D351-70;D351-71). This kind of widespread confusion, actually causing errors by parents, evidences real damage to a provider like FLVS, and would at least allow a jury to justly and reasonably infer that additional students were diverted from FLVS to FLOS. *Ramada*, 804 F.2d at 1565.

In a trademark case, jurors may also infer actual damage from loss of "reputation and goodwill" or "control over reputation" when presented with evidence of actual confusion. *See Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1241 (11th Cir. 2008) (holding that such damages formed an alternative basis for a jury's actual damages award); *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 15 (1st Cir. 2004) (holding that actual confusion "could inflict a commercial injury in the form of . . . a diversion of sales, damage to goodwill, or loss of control over reputation" and collecting supporting caselaw from the Second, Fourth, Sixth, and Seventh circuits). Such inferences are especially

appropriate here given the highly probative nature of actual confusion evidence, *Id.* at 18, and the well-established principle that a plaintiff in a Lanham Act case may recover damages "as a matter of just and reasonable inference, although the result may only be an approximation." *Ramada*, 804 F.2d at 1565. FLVS's substantial evidence of actual confusion would permit a jury to infer that K12 commercially injured FLVS by impacting its reputation, control over its reputation, and goodwill among the public.

The district court granted summary judgment against FLVS on its claim for actual damages because Kalajian "attempted to enroll her [daughter] with Plaintiff" but eventually decided not to go "forward with FLVS," and by broadly holding that FLVS's other evidence was insufficiently specific. (D306:2–4). These holdings misapplied the legal standard, erroneously viewing the evidence in the light least favorable to FLVS. *See FCOA*, 57 F.4th at 959 (admonishing district courts to correctly apply the summary judgment standard on this issue). The evidence, viewed in the light most favorable to FLVS, shows that Kalajian would have timely enrolled in FLVS, not FLOS, had she not been confused, and that Kalajian ultimately did not enroll her daughter in FLVS because she learned of her error too late to complete enrollment before the school year started. (D142-19). A reasonable jury could find that without this confusion, Kalajian would have successfully found and enrolled in FLVS. (*Id.*).

30

The district court also erroneously held FLVS to a standard not found in the law to identify actual damages. FLVS did not need to specifically identify every person who mistakenly enrolled in FLOS to show lost sales or damage to reputation and goodwill; such a task is impossible given the nature of trademark confusion. *Ramada*, 804 F.2d at 1564-65. FLVS only needed to present sufficient evidence for a jury to infer lost sales or harm to goodwill or reputation. *Beacon*, 376 F.3d at 17 (rejecting the contention that "only *direct* evidence (with no room for inference) may establish harm to goodwill" or lost profits from confusion). FLVS met this burden with evidence of mistaken enrollments, and widespread confusion. This evidence raised a jury question erroneously taken from the jury.

This error must be remedied by reversal of the summary judgment against FLVS on its FLOS-related infringement claims, reversal of the Phase II bench trial findings of fact, and remand for a jury trial.

**B.    Alternatively, the district court clearly erred in evaluating likelihood of confusion.**

If the Court does not remand for a jury trial, then FLVS alternatively argues the district court erred in evaluating likelihood of confusion. For this analysis, the Court first considers factors like strength of the mark, actual confusion, intent to infringe, and similarities between customers, trade channels, advertising, marks, and services. *FCOA*, 57 F.4th at 947. The Court then weighs these factors together, with the most important factors being strength of the mark and actual confusion.

31

*Id.* Here, the district court erred in applying the law and weighing the evidence for nearly every factor.

There are "two steps in assessing the strength of a mark: conceptual strength and commercial strength." *Id.* at 948. Conceptual strength places "a mark on the sliding scale of trademark strength, from weakest to strongest: (1) generic, (2) descriptive, (3) suggestive, and (4) fanciful or arbitrary." *Id.* at 949. "Incontestable descriptive marks . . . are statutorily presumed to be valid and thus must have some degree of secondary meaning." *Id.* A descriptive mark with secondary meaning (i.e., consumer recognition) "is strong enough to be valid under the Lanham Act." *Id.* Incontestable marks are also presumed to be "relatively strong mark[s]" until rebutted by evidence of third-party use. *Id.* at 950. "Commercial strength refers to the real-world consumer recognition of a mark, most often created by the efforts and work of the mark holder." *Id.* "Commonly used evidence of commercial strength includes third party use; advertising and promotion; sales and number and types of customers; recognition by trade, media, and customers; and survey of likely customers." *Id.*

The district court correctly presumed that the incontestable "Florida Virtual School" and "FLVS" marks were "relatively strong" under the conceptual strength prong. (D369:11). But the court clearly erred by finding that the non-incontestable marks, which are textually identical, were "relatively weak." (*Id.*). The same word

marks cannot logically be both conceptually strong and weak when referring to the same entity, and the additions in the design marks would only serve to further distinguish and thus strengthen the strong word marks.

For commercial strength, the district court clearly erred by finding the "Florida Virtual School" mark weak when the survey evidence shows it was the most recognizable brand among all Florida online education providers. (D351-21:6). Having the most recognizable mark in an industry unambiguously demonstrates commercial strength. A mark is not weak because it is "only" 10–15% more recognizable than its nearest competitor in its *lowest* data points, especially when the data points more commonly show superiority greater than 20%, to a maximum of 27.6%. (D351-21:6;D338:22–25). This is especially true when consumer recognition of "Florida Virtual School" consistently remained in the upper 40% to lower-mid 50% for the two years FLOS operated, with only *one* month during that period—June 2021—showing recognition below 40%. (D351-21:6). In contrast, K12's recognition in June 2021 was approximately 10%. (*Id.*).

The court correctly described K12's highest brand recognition in March 2021 of 42% as "substantial," but in the same breath, illogically described FLVS's *higher* brand recognition in March 2021 of 50.4% as weak. (D369:13;D351-21:6). It cannot be both—if 42% recognition is "substantial," then 50.4% recognition is more substantial. And while all Florida online education providers have relatively

low unprompted consumer recognition, this means only that FLVS has not joined the small band of famous brands with universal unprompted recognition like "Disney" or "McDonald's." *See* 15 U.S.C. § 1125(c)(2)(A) (listing elements of a "famous" mark).

The court further clearly erred by discounting the significant circumstantial evidence of commercial strength, including millions on advertising annually, 78 million annual consumer impressions, 7,340,000 student semester completions, and 57 industry awards. (D337:19–30;D351-69;D334:98–99). This is strong evidence of commercial strength and secondary meaning which should have been accounted for. *FCOA*, 57 F.4th at 950.

The district court also clearly erred in considering an unspecified number of "[County] Virtual School" programs (e.g., "Broward Virtual School") to be third-party uses of FLVS's marks. (D369:14–15). "[County] Virtual School" names are not confusingly similar to "Florida Virtual School" because the geographic designation distinguishes them. A consumer viewing both "Florida Virtual School" and "[County] Virtual School" would readily understand that the former is a Florida state school and the latter is a local county school. This is why marks like "Brazilian Virtual School" and "Idaho Virtual School" would not be third-party uses of "Florida Virtual School." *Cf. Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc. ("FIU")*, 830 F.3d 1242, 1257 (11th Cir. 2016) (considering only

34

schools with both "Florida" and "University" in their name to be third-party uses of "Florida International University"). The court thus erred by holding that "[County] Virtual School" usages rebutted the presumption of strength for FLVS's incontestable marks.[5]

The district court also clearly erred by misapprehending FLVS's evidence of substantial actual confusion as a matter of law and fact. "Evidence of actual confusion is the best evidence of a likelihood of confusion." *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 137 (11th Cir. 2022) (cleaned up). The Court has repeatedly "held that a mere two instances of confusion from relevant consumers was worthy of consideration." *Id.* at 139 (collecting cases). "Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971).

FLVS presented testimony of actual confusion through witnesses and documents. Two parents, Kalajian and Kornheisl, testified that they wished to enroll their children in FLVS but were confused by the FLOS marks. (D338:106–

---

[5]    The court found another entity *sua sponte*, Florida Virtual Campus, which "had not been raised by either party." (D369:14). The court did not find that this was third-party usage, but even if it was, a single third-party usage is not extensive enough. *Cf. FIU*, 830 F.3d at 1257 (requiring 12 usages).

108;D342:16–18). These two examples of direct consumer confusion are highly probative of actual confusion alone, especially when considered with FLVS's significant documentary evidence of actual confusion among parents, students, and school officials. *Supra* pages 10–13. This evidence shows consumers regularly confusing FLVS with FLOS, and FLOS employees like Dale and Kershner confirming that confusion. *Id.*

The district court clearly erred by discounting this evidence. The court found that Kalajian's testimony did not demonstrate actual confusion because Kalajian thought there was only one Florida online education provider. (D369:18–19). But Kalajian specifically testified that she was confused by the marks, not "her misconception that there was only one online education provider available to her." (D338:113). Indeed, this "misconception" only existed due to the strength of FLVS's marks and the close similarities between the FLVS and FLOS marks. Consumers are rarely if ever aware of all their options, so trademarks serve to distinguish between companies. *Jack Daniel's Props., Inc. v. VIP Products LLC*, 599 U.S. 140, 146 (2023) (trademarks "identify the origin or ownership of the article to which it is affixed" and "distinguishes that source from others"). Kalajian would have known FLOS was not FLVS if the marks were not "interchangeable." Similarly, if a consumer who thinks "Google" is the only search engine mistakenly

36

uses a knock-off "Gooogle" engine, her confusion arises because the marks are nearly identical, not from Google's market dominance.

The court apparently found that Kornheisl intended to enroll in FLOS initially and switched to FLVS for scheduling reasons based on an off-hand comment that she enrolled in FLOS "not realizing the schedule, and then immediately realized that wasn't the right thing for us as a family." (D369:19–20). The evidence did not support this. Kornheisl clarified this comment twice during her testimony, explaining that her receipt of the FLOS schedule was what tipped her off to her mistaken mis-enrollment in FLOS, not that she wanted to enroll in FLOS initially. (D342:16–18,21–23). Kornheisl explicitly testified that her confusion over the parties' marks caused her to mistakenly enroll her son in FLOS. (D342:19). This is the only plausible reading of her testimony.

The court also chose to ignore the many emails clearly demonstrating actual confusion by parents, students, and administrators, and the statements by FLOS employees (including testimony from Kershner and Dale) acknowledging this confusion. (D369:20–22). The court did not analyze this evidence, instead broadly discounting it as unreliable and possible hearsay without live testimony and cross-examination. (*Id.*).

This was clear error. "There is no hearsay problem" with actual confusion evidence because "[h]earsay is an out-of-court statement admitted for the truth of

the matter asserted," while actual confusion evidence is "probative of the declarant's confusion." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003–04 (2d Cir. 1997). A district court cannot simply admit such actual confusion evidence and then waive it away as "unreliable." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001). The *Lyons* district court, like the district court here, admitted documentary evidence of consumer confusion but then broadly dismissed it as unreliable and possibly hearsay which could not "support a finding concerning actual confusion." *Id.* The Fourth Circuit reversed because "[t]his was direct evidence" of consumer confusion which "was highly probative." *Id.* Here, like in *Lyons*, the district court should have considered this evidence clearly evidencing actual confusion.

The court also erred by weighing the lack of survey evidence of consumer confusion against FLVS. (D369:22). "Lack of survey evidence does not weigh against the plaintiff when determining likelihood of confusion." *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1169 (11th Cir. 2019).

The district court clearly erred by finding no intent to infringe. K12 spent two decades using various marks nearly identical to FLVS's. This infringement continued after the Prior Lawsuit with the FLVA.com and FLOS marks, and on K12's Florida landing page to redirect consumers searching for FLVS to K12 through SEM and SEO. (D342:227–228;D351-85;D351-86;D351-54;D351-

55;D350-24). K12 attempted to cover up this ongoing infringement by ordering its website changed mid-trial and informing witnesses about trial events, hindering cross-examination and violating the Rule of Sequestration, Fed. R. Evid. 615, then restoring the FLOS marks to its website after trial. (D361:12–14;D361-1;D351-85;D351-86). This pattern clearly shows K12's intent to infringe on FLVS's marks as long and as much as possible while avoiding consequences.

The court discounted the continued use of "Florida Online School" on K12's Florida landing page in the intent analysis due to the court's assumption without analysis that this usage was non-trademark, a mistake of law. (D369:24–25). The six instances of "Florida Online School" on the K12 Florida landing page all referred to K12's Florida education services and all but one appeared in prominent places like the URL or on headers with larger than normal text and a different color than the rest of the page. (D351-86:2,3,5,27,28); *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 401 (2d Cir. 2009) (lettering, type-style, size, visual placement, and location indicate trademark usage). The emphasis K12 placed on this language, plus its recent use of "Florida Online School" to refer to its Hendry County program, constituted trademark usage. K12 conceded as much in its letter to the court, writing that it altered this webpage "to stop using the Florida Online School name in reference to the Hendry County program." (D356-2). The court further erred by stating "non-attorney employees" made these changes when K12 admitted

its General Counsel directed the alterations and informed the witnesses. (D356-2;D353:85).

The court correctly recognized that the parties' word marks were nearly identical. (D369:27). But the court erred as a matter of law by holding that the similarity of marks factor was "neutral" because the parties' design marks were distinguishable. FLVS pled infringement of its word and design marks separately, (D1:12–16), and the court should have found this factor favored FLVS for at least its word marks.

The court also clearly erred by assuming without evidence that FLVS's customers were "sophisticated." (D369:29–30). The court cited no evidence for this assumption, instead simply assuming this was true given "the nature and importance of a parent's choice of where to educate their child." (*Id.*). While some parents may be sophisticated, many are not—parents do not pay to enroll their children with FLVS or K12, and so lack a financial incentive to conduct significant research. (D337:40–41). Kalajian conducted no research, and even a teacher familiar with FLVS and K12 like Kornheisl who performed research was confused, showing (if anything) that parents are not sophisticated, or that their level of sophistication was insufficient to overcome their confusion. (D338:106;D342:11–15).

The court correctly found the parties' services were similar given they provided the same type of education. (D369:30–31). The parties' customers, trade channels, and advertising are similar because they cater to the "same general kinds of individuals"—Florida parents, students, and schools seeking an online education provider—contact individuals through the same medium, the internet, and focus their advertising on the same targets, i.e., parents, students, and schools. *FCOA*, 57 F.4th at 947, 954–55. The court held all these factors neutral because K12 claimed its only customer was Hendry County, not the parents or students it served, and that it only advertised its K12 brand, not the FLOS marks. (D369:32). This was legal and factual error because: (1) FLVS, like FLOS, also partners with school districts, meaning they cater to the same consumers regardless; (2) even if FLOS did not consider parents and students its "customers," FLOS and FLVS provided services and catered to the "same general kinds of individuals," i.e., parents, students, and schools, which is all the similarity of customer factor requires; (3) similarity of advertising focuses on the medium the parties advertised through, not the brands they focused on, and the court acknowledged that both FLVS and FLOS advertise through the same medium, the internet; and (4) even if K12 focused on advertising its K12 brands, this advertising ultimately directed students to the FLOS marks on its websites. (D334:157–159;D342:151,174–175,194–198;D369:32;D351-86:10–27).

41

Since all factors favor FLVS, the Court should find likelihood of confusion. Even if the Court disagrees with the strength of some factors, not all factors need to favor FLVS to show likelihood of confusion, especially if the strongest factors favor FLVS. *Tana v. Dantanna's*, 611 F.3d 767, 775 n.7 (11th Cir. 2010) ("The likelihood-of-confusion multifactor test presupposes that various factors will point in opposing directions."). If the Court believes the district court made errors of law with more than one factual resolution, the Court should alternatively reverse and remand for further consideration. *Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982).

## C.     Gallogly's lost profit opinions are reliable and helpful.

The Court should also reverse the exclusion of Gallogly's actual damages opinions relating to FLOS because his methodology was sufficiently reliable and helpful. Under *Daubert*, an expert must be qualified, employ reliable methodology, and assist the trier of fact. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). Expert testimony is reliable if it is testable and employs generally accepted methodologies, among other factors. *Id.* at 1262. Expert testimony is helpful if "it concerns matters that are beyond the understanding of the average lay person." *Id.*

Gallogly's lost profits methodology is commonly accepted and easily clears the *Daubert* threshold. Gallogly calculated the additional FEFP revenue each

FLOS student would have brought FLVS, calculated and then subtracted the incremental costs FLVS would have incurred per additional student based on his examination of financial records and interviews with FLVS employees, and then multiplied by FLVS's historical retention rate and a discount rate to calculate future lost profits. (D273-1:10–35). This methodology is testable and follows generally accepted accounting principles. (D273-1:3).

The district court's primary criticism of Gallogly's lost profits opinions is that he did not opine on causation and liability. (D287:6). The court essentially held that damages experts cannot just provide a damages model, but must also weigh in on causation and liability for their opinions to be reliable. (*Id.*). But causation and liability, while certainly elements plaintiffs must prove, have nothing to do with the reliability of a damages model. The proper method for resolving questions of liability and causation pre-trial is through summary judgment, not the methodology prong in a *Daubert* analysis of a damages expert. Indeed, under the court's test, no CPA could offer a damages opinion under *Daubert*: forensic accountants are not typically also experts in causation and liability.

Excluding a damages expert because he assumes liability or causation is unworkable. This is why circuit and district courts almost universally conclude that damages experts may assume causation and liability. *See*, *e.g.*, *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 660 (N.D. Ill. 2006) (collecting circuit caselaw

holding that "[a] damages model would, of course, be necessarily consistent with liability, or necessarily assume liability"); *Sancom, Inc. v. Qwest Commc'ns Corp.*, 683 F. Supp. 2d 1043, 1068 (D.S.D. 2010) ("And, it is well-settled that a damages expert like Canfield can testify as to damages while assuming the underlying liability."). Such assumptions are particularly appropriate in Lanham Act cases where damages "are not susceptible to precise calculations." *Ramada*, 804 F.2d at 1565. Indeed, it would likely be error to *permit* an accountant to opine on causation and liability. It was error to exclude this expert for refusing to do so.

The district court's remaining methodological criticisms are equally unavailing. Gallogly's lost profits opinions necessarily pertained only to the FLOS-related infringement claims and so were already separated out on a case-by-case basis. (D273-1:10–12). While Gallogly did calculate the maximum amount of profits FLVS would have suffered if all FLOS students had been diverted from FLVS, his methodology and opinions did not assume this would happen. Instead, he provided a model to calculate lost profits per student diverted from FLVS to FLOS. (D273-1:14–17). It was thus properly left for the jury to evaluate causation and liability and assign damages accordingly.

Gallogly reliably calculated future lost profits by assuming that some students who would have enrolled in FLVS but-for confusion from FLOS would have stayed enrolled in FLVS in future years based on FLVS's historical retention

rate. (D273-1:18–20). This assumption, which was supported by hard data from FLVS's records, is also simply common sense—the nature of education is such that students tend to remain enrolled at a school for more than one year, even more so with an online program where a move in residence does not necessarily require a change in school. So even though FLOS changed its name to DAOF in 2022, FLVS still lost out on future profits from the percentage of students who would have enrolled and stayed enrolled in FLVS but-for confusion regarding FLOS before the name change.

Nor were Gallogly's opinions "simple math" within the ken of an ordinary juror. (D287:5). While the jury's final calculation would certainly involve multiplying variables like lost sales, FEFP rates, Contribution Margin Percentages, retention rates, and the discount rate, the jury would first need expert testimony to explain how the FEFP process works and to establish complicated accounting concepts like the Contribution Margin Percentage and discount rate. The average juror would not be aware of the various costs FLVS incurs per student or how to use those costs to craft a Contribution Margin Percentage. (D273-1:21–26). Nor would they know how to determine the present value of future lost profits using the weighted average cost of capital or the Capital Asset Pricing Model. (D273-1:27–30). Accounting principles like these are beyond the understanding of the ordinary

person—that is why accounting exists as a profession and is a well-recognized area of expertise.

Accordingly, FLVS requests that the Court reverse the district court's order excluding Gallogly's lost profit opinions on remand.

## II.    THE DISTRICT COURT ERRED IN ENTERING SUMMARY JUDGMENT ON THE FLVA.COM INFRINGEMENT CLAIM.

The district court erred in granting summary judgment on the FLVA.com infringement claim because this claim was properly asserted and the 2015 Settlement Agreement only barred claims that arose before February 3, 2015.

The court erred by evaluating this claim based on its review of FLVS's legal memoranda instead of the complaint. (D306:4–5). This Court has condemned

> [t]he current practice in some district courts—especially in the summary judgment setting—[] to ignore what the respective parties alleged in their complaint and answer and to consider their claims and defenses as depicted in the memoranda they filed in support of or in opposition to a motion for summary judgment.

*Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227 (11th Cir. 2013). "And it goes without saying that the court is barred from amending a plaintiff's claim" based on summary judgment memoranda because "the court may create the impression that it has become the plaintiff's advocate— or his worst enemy—depending on what the court does with the claim after amending it." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013). Instead, a claim is properly raised if the plaintiff pleads "a

46

short and plain statement" in its complaint that "gives the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (cleaned up).

FLVS pled that K12's continued use of FLVA.com to redirect web traffic to its FLCCA website after the 2015 Settlement Agreement was "infringing and confusing" and would lead "consumers of FLVS's educational services" to "believe that Defendants' services originate with FLVS, or that Defendants are somehow affiliated with, sponsored by, or endorsed by FLVS." (D1:10–11). These allegations were incorporated into each of FLVS's trademark infringement counts and were pled under their own bolded header entitled "***Defendants' Use of the FLVA.COM Domain***" after a lengthy description of how K12 had previously infringed upon FLVS's marks using "FLVA." (D1:6,10). This was unambiguously a well-pled trademark claim. *See FCOA*, 57 F.4th at 946.

Tellingly, the district court never disputed that FLVS properly pled this claim. The court merely explained, "This case now encompasses over three hundred docket entries; in none of these papers has Plaintiff based its trademark infringement **arguments** on Defendants' use of the FLVA.com." (D305:5) (emphasis added). But the court cannot amend FLVS's well-pled complaint to remove its FLVA.com infringement claim *sua sponte* based on its interpretation of

FLVS's arguments.[6] *Miccosukee*, 716 F.3d at 559. The two memoranda the court identified as not mentioning the FLVA.com infringement claim, FLVS's partial summary judgment motion and response to K12's motion to dismiss, also did not disclaim the infringement claim. (D305:5;D20:9;D141). FLVS was not required to move for summary judgment on all its claims in its *partial* summary judgment motion, and FLVS's motion to dismiss response only briefly listed its FLOS-related claims "*inter alia*," or "among other things." (D20:9;D141); INTER ALIA, Black's Law Dictionary (11th ed. 2019). Plaintiffs are not required to move for summary judgment on their claims at all, and briefly describing some claims as "*inter alia*" does not imply an exhaustive list of claims. Rather, language like "partial" and "*inter alia*" suggests the opposite.

The district court's finding that the 2015 Settlement Agreement barred the FLVA.com infringement claim is also error. The agreement only barred claims arising "on or before the Effective Date" of November 3, 2015. (D350-14:1,8–9,15–16). Infringement claims arising after this date are not barred. (*Id.*). The FLVA.com infringement claim arose after the URL Safe Harbor protections

---

[6]    Regardless, the court's review of the memoranda was also incorrect. FLVS raised its FLVA.com infringement claim in the *Daubert* responses whose reconsideration led to summary judgment, and in its interrogatory answers. (D273:2–4,12,17,19–20;D144-2:4).

expired on December 31, 2016. (D350-14:5;D144-1:5–6). This is why FLVS only sought disgorgement of FLCCA profits from January 2017 onwards. (D273-1:31).

Moreover, K12 breached the 2015 Settlement Agreement through its continued use of FLVA.com, releasing FLVS from any release obligations. *Small v. State*, 249 So. 3d 675, 676 (Fla. 2d DCA 2018) ("It is a well-established principle of contract law that one party's material breach relieves the other party of his obligations under the contract."). K12 also could not receive summary judgment based on a contractual release because K12 (tellingly) never pled those affirmative defenses in its amended answer. (D155:28–30); *Funding Sys. Leasing Corp. v. Pugh*, 530 F.2d 91, 95 (5th Cir. 1976) ("affirmative defenses must be set forth in a responsive pleading or be deemed waived").

The district court also reversibly erred by granting summary judgment on the FLVA.com infringement claim in response to a motion for reconsideration of a *Daubert* order long after the deadline to move for summary judgment closed. (D306;D156). This procedural detour failed to provide sufficient notice that summary judgment was at issue on this claim, and prejudiced FLVS by preventing it from having any opportunity to respond to summary judgment arguments raised by the court. This is an independent ground for reversal. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999) (*sua sponte* grant of summary judgment reversible error unless plaintiff "is given sufficient advance notice and

has been afforded an adequate opportunity to demonstrate why summary judgment should not be granted").

Accordingly, the Court should reverse the grant of summary judgment on FLVA.com infringement so FLVS can try this claim.

## III. THE DISTRICT COURT ERRED IN RESOLVING THE FALSE ADVERTISING CLAIM.

The district court erred by excluding Dr. Stec's testimony and granting summary judgment on the false advertising claim. The elements of a Lanham Act false advertising claim are:

> (1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been – or is likely to be – injured as a result of the false advertising.

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). The only element at issue here is whether the Checklist was false or misleading. (D261:11). "Consumer survey research often is a key part of a Lanham Act claim alleging that an advertisement is misleading or deceptive." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004). "[A]lleged technical deficiencies affect the survey's weight, however, and not its admissibility." *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 844 (11th Cir. 1983).

The district court found that Dr. Stec was qualified and that his survey mechanics were "generally acceptable and do not invoke controversial analysis." (D261:10). These findings, coupled with the obvious helpfulness of consumer surveys in establishing "that an advertisement is misleading or deceptive," *Hickson*, 357 F.3d at 1261, should have concluded the court's *Daubert* analysis. This, in turn, should have prevented summary judgment because Dr. Stec's opinions are evidence that the Checklist is misleading. (D181-1:28–30).

Instead, the court excluded his opinions because his survey did not permit respondents to review the websites of K12's competitors and assess whether they provided the same services as K12. (D261:9). The court believed that "[t]he Checklist is a marketing tool inviting the reader to compare the features of Defendants' programs with competing online educational programs" because the webpage preceding the Checklist stated "use this checklist to weigh your options." (D261:8–9). The court assumed that "[i]f the survey respondent were allowed to make this comparison, she would see that Plaintiff offers the same features, there would be no deception, and FLVS would suffer no harm." (D261:9). The court found that Dr. Stec's opinions employed an unreliable methodology because his survey did not permit respondents to access FLVS's website. (D261:10). The court then granted summary judgment "because no admissible evidence showing consumer deception has been offered." (D261:13).

This reasoning improperly treated an invitation to "weigh your options" as a disclaimer curing misleading impressions while assuming consumers viewing the Checklist had perfect context of FLVS's services. But "weigh your options" is not a disclaimer—K12 never said or implied that FLVS or other competitors offered the services listed on the Checklist. (D181-1:175–181;D144-1:57). Moreover, disclaimers are generally insufficient to cure misleading impressions created by advertisements. *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989). "Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." *Id.*; *FTC v. On Point Cap. Partners, LLC*, 17 F.4th 1066, 1080 (11th Cir. 2021) (disclosures which are "either too small or too vague to dispel the misrepresentations otherwise created by the websites" are not "sufficient to disabuse consumers of" misleading impression). A bare invitation to "weigh your options" says nothing "to change the apparent meaning of the claims and to leave an accurate impression." *Id.* If even express disclaimers are insufficient to cure misleading advertisements, then "weigh your options" must also be insufficient.

The court also erred by assuming consumers viewing the Checklist would have perfect knowledge of the services offered by K12's competitors. (D261:9).

52

Courts may not assume consumers have any context beyond what is apparent from the advertisement. *Johnson*, 299 F.3d at 1248 ("While the court should consider context, it may not *assume* context."). Courts cannot assume that consumers will fully research their options and discover advertising deceptions because no advertisement would ever be misleading if this were so. The court held that because consumers *could* figure out K12's deception through sufficient research, no deception can ever occur. This circular reasoning would prevent any finding that advertisements are misleading because consumers could theoretically always dispel the deception with sufficient research.

The court compounded these misapprehensions of false advertising principles by applying them to the reliability prong of *Daubert*. The court found Dr. Stec's survey unreliable because he did not let respondents conduct extensive research mid-survey to "weigh [their] options." (D261:8). But survey experts, like courts, cannot assume that consumers will conduct extensive research to gain context they do not already possess. *See Johnson*, 299 F.3d at 1248. Dr. Stec properly tested the impressions created by the Checklist using widely accepted survey methodologies and found the Checklist created the impression that K12 offered services that FLVS and other competitors did not. (D181-1:1–28). This is precisely what Dr. Stec needed to test. His methodology was not unreliable because he did not force respondents to perform research mid-survey. In fact,

forcing respondents to conduct research mid-survey would have rendered his methodologies unreliable by employing assumptions that do not necessarily mirror real-world conditions.

The district court further erred by concluding that the Checklist was not literally false by necessary implication. "Statements that have an unambiguous meaning, either facially or considered in context, may be classified as literally false." *Osmose, Inc. v. Viance*, 612 F.3d 1298, 1309 (11th Cir. 2010). "A 'literally false' message may be either explicit or 'conveyed by necessary implication' when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586–87 (3d Cir. 2002) (quoting *Clorox Co. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 35 (1st Cir. 2000)). The Checklist, considered in context, is literally false by necessary implication because it checks all boxes for K12 and none for FLVS after asking "What makes K12-powered schools different from other online learning solutions like . . . FLVS." (D144-1:57). The obvious implication of "[w]hat made K12-powered schools different" is that K12 provides the checked services while other schools do not. That is a literally false statement, or at least a false statement which the factfinder could find. (D144-1:5;D171-8;D171-9).

54

The court found that the Checklist was not literally false because "[t]he only 'statements' in the checklist are the features offered by Defendants, represented by checked boxes." (D261:12). But this analyzed the Checklist out of context by ignoring the unchecked boxes and the preceding statement asking "[w]hat makes K12-powered schools different." (*Id.*). The court erred by not considering how these statements altered the message conveyed by the Checklist.

For these reasons, the Court should reverse the exclusion of Dr. Stec's expert testimony and the grant of summary judgment on the false advertising claim and remand for further proceedings.

## IV.  THE DISTRICT COURT ERRED IN LIMITING DISGORGEMENT AND EXCLUDING GALLOGLY'S DISGORGMENT OPINIONS.

The district court erred by preventing FLVS from seeking disgorgement of K12's national and FLCCA profits and excluding Gallogly's national and FLCCA disgorgement opinions as irrelevant. Plaintiffs may recover a "defendant's profit" after prevailing on Lanham Act claims like trademark infringement or false advertising. 15 U.S.C. § 1117(a). To obtain disgorgement, "[i]t is enough that the plaintiff proves the infringer's sales." *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488 (11th Cir. 1987). "The burden then shifts to the defendant, which must prove its expenses and other deductions from gross sales." *Id.* The defendant also has the burden "to isolate the profits which are attributable to the use of the infringing mark." *Mishawaka Rubber & Woolen Mfg.*

*Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207 (1942). Accordingly, a Lanham Act plaintiff on summary judgment may seek disgorgement of any defendant profits unless the defendants can establish that no reasonable factfinder could attribute these profits to the Lanham Act violation. *Id.*

The district court limited the disgorgement remedy and excluded Gallogly's national and FLCCA revenue opinions as irrelevant because these profits were "unrelated" to FLVS's claims for FLOS-related infringement and the court had granted summary judgment on all other claims. (D287:5). Neither the court nor K12 raised any other objection to such disgorgement or the admissibility of Gallogly's disgorgement opinions, and the court permitted Gallogly to testify about K12's FLOS profits. (D287:7;D267). Therefore, should this Court reverse the grant of summary judgment on the FLVA.com infringement claim, it should also reverse the district court's FLCCA disgorgement limitation because K12's FLCCA profits are attributable, at least in part (and certainly at the summary judgment stage), to K12's infringing use of FLVA.com to redirect web traffic to the FLCCA website. The Court should similarly reverse the exclusion of Gallogly's FLCCA opinions because such opinions are relevant to this remedy.

Should the Court reverse the grant of summary judgment on the false advertising claim, the Court should similarly reverse the limitation on disgorgement of national profits and the exclusion of Gallogly's opinions thereon.

FLVS and K12 compete for enrollments nationwide, and the Checklist was available on K12.com, K12's primary website upon which most of its internet advertising is focused. (D144-1:57;D302:16;D342:151–153,174–175,194–198). Thus, the claim is akin to a nationwide false advertising campaign that places all K12 U.S. profits at issue unless K12 can meet their burden to apportion them, a fact question. K12 offered no methodology to apportion its national profits.

The Court should also reverse the limitation on disgorgement of national profits and the exclusion of Gallogly's opinions thereon if it reverses any of the trademark infringement claims. K12's use of FLVA.com and the FLOS marks were available nationwide on its website and so could have confused consumers outside of Florida. Reversal is especially appropriate given that FLVS presented evidence that relevant stakeholders outside of Florida were actually confused by K12's FLOS marks, including a Texas school administrator and an Alaskan parent. (D351-7;D351-47).

## V.    THE COURT SHOULD REASSIGN THIS CASE ON REMAND.

FLVS respectfully requests that the Court exercise its supervisory authority to reassign this case on remand given the district judge's harsh and public condemnations of FLVS and its marks and his procedural irregularities. The Court may order reassignment "to another district judge as part of [its] supervisory authority over the district courts in this Circuit." *United States v. Torkington*, 874

F.2d 1441, 1446 (11th Cir. 1989) (citing 28 U.S.C. § 2106). "Reassignment is appropriate where the trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public." *Id.* The Court "consider[s] at least three elements in determining whether to reassign a case to a different judge based on the original judge's actions at trial where there is no indication of actual bias: (1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; (3) whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment." *Id.* at 1447. The Court may also consider the judge's prior reversals. *Id.*

The district judge harshly and repeatedly condemned FLVS as a "'trademark bully' harassing a competitor" with "among the most generic, descriptive—and therefore *weak*—marks the Court has seen." (D369:35–36). The judge believed that "Plaintiff's argument exposes its attempt to use its weak trademarks to bully its competitors," found that "the intent evidence supports a strong inference against *Plaintiff*, not Defendants," and described FLVS's trademark infringement claims as "feeble" and "grossly insufficient." (D369:25,35). The judge's animus towards FLVS was such that he blamed *FLVS*, not K12, for the decision by K12's General Counsel to alter evidence and violate the Rule of Sequestration mid-trial,

portraying K12 as an innocent victim "scrambling to avoid the swinging arms of a bully" and erroneously finding these actions were ordered by "non-attorney employees," not K12's General Counsel. (D369:24). The judge also inexplicably stated FLVS's marks were obtained under "dubious circumstances" which were "not lost on the Court" despite finding, just weeks earlier in his Phase I ruling, that FLVS did not commit fraud, intentionally or otherwise. (D369:11;D363).

These unnecessary comments served to publicly denounce FLVS and hinder future attempts to enforce its trademark rights. These comments were far worse than the *Torkington* judge's relatively mild description of a prosecution as "silly," a "vendetta," and "a waste of taxpayers' money" which the Court found warranted reassignment. *Torkington*, 874 F.2d at 1447. They suggest that the district judge may have difficulty setting aside these previous views and findings. Even if the judge could set aside such strong opinions, these condemnations will leave a lingering pall over this case that will undermine the appearance of propriety and impartiality in the eyes of the public.

The judge's procedural irregularities further support reassignment. It was irregular and unfair for the judge to grant multiple instances of summary judgment in an order denying reconsideration of a *Daubert* ruling without any notice that summary judgment was at issue. It was also inappropriate for the judge to condemn FLVS as "sophomoric" and "seemingly unable to comprehend or

59

unwilling to accept the Court's rulings in this case" for raising these issues when the judge had, quite clearly, *not* yet heard and resolved them. (D306:1–2). The judge's interpretation of the FLVA.com infringement claim based on the arguments instead of the pleadings created the "impression" that the judge had become FLVS's "worst enemy." *Miccosukee*, 716 F.3d at 559. The judge's decision to go beyond the record at trial and search for potential third-party usages like Florida Virtual Campus also undermines the appearance of propriety and impartiality. (D369:14). Notably, this same judge was previously reversed in the Prior Lawsuit after dismissing FLVS's suit at the earliest possible instance based on a novel theory that FLVS could not bring trademark suits at all.

Reassignment would not "entail waste and duplication out of proportion to [the] gains realized." *Torkington*, 874 F.2d at 1447. While the judge has certainly invested several years in this case, the Court's decision will resolve all pending *Daubert* and dispositive motions and leave the new judge with little work besides resolving the issues identified by the Court. Since reversal will likely entail a new trial, the new judge will have the opportunity to try the case without requiring significant duplicative judicial labor. Any limited waste or duplication is far outweighed by the need to ensure the appearance of propriety and impartiality.

## CONCLUSION

For the foregoing reasons, FLVS respectfully requests that the Court reverse the judgment below and remand for a jury trial before a new district judge.

Respectfully submitted,

/s/ *Thomas E. Bishop*
Thomas E. Bishop
Florida Bar Number 956236
John S. Mills
Florida Bar Number 107719
Kyle William Mason
Florida Bar Number 1045149
Katharine Roth
Florida Bar Number 106692
BISHOP PAGE & MILLS, PLLC
510 N. Julia Street
Jacksonville, FL 32202
Tel. (904) 598-0034
Fax. (904) 598-0395
tbishop@bishoppagemills.com
jmills@bishppagemills.com
kmason@bishoppagemills.com
kroth@bishoppagemills.com
service@bishoppagemills.com

*Attorneys for Appellant Florida Virtual School*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) in that it contains 12,959 words (including words in footnotes and excluding the parts of the brief exempted by

Fed. R. App. P. 32(f)) according to Microsoft Word, the word-processing system used to prepare this brief.

/s/ *Thomas E. Bishop*
Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2024, I sent four paper copies of this brief to the Clerk of this Court by mail pursuant to 11th Cir. R. 31-3. I also electronically filed this brief on May 23, 2024 using the Court's Appellate PACER system, which will automatically send notification to counsel of record.

/s/ *Thomas E. Bishop*
Attorney